SO ORDERED: February 20, 2013.



_____
**Robyn L. Moberly
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOHN RICHARD JULIAN | ) | CASE NO. 12-7394-RLM-7 |
| JOYCE KAYE JULIAN | ) | |
| | ) | |
| Debtors | ) | |
| | ) | |
| HERBERT W. DISHMAN and | ) | |
| KARLA J. DISHMAN, | ) | Adversary Proceeding |
| | ) | No. 12-50275 |
| Plaintiffs | ) | |
| vs. | ) | |
| | ) | |
| JOHN RICHARD JULIAN and | ) | |
| JOYCE KAYE JULIAN | ) | |
| | ) | |
| Defendants | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Plaintiffs, Herbert and Karla Dishman, (the "Dishmans") filed their complaint

to determine the dischargeability of a certain debt allegedly owed to them by the

Defendants John and Joyce Julian (the "Defendants") on August 30, 2012. Trial on the Dishmans' complaint was held on February 11, 2013 wherein the Plaintiffs appeared in person and by counsel, Vance W. Curtis; the Defendants appeared in person and by counsel, Juan Perez, Jr. At the conclusion of the trial, the Court took ruling on the matter under advisement. The Court, having considered the testimony of the witnesses, the arguments of counsel, and all the evidence admitted, now makes its written findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

### *Findings of Fact*

1. From 1998 to July 2008, Defendant John Julian ("John") was the sole proprietor of Julian Roofing. In July, 2008, fire destroyed both the residence which the Defendants were renting as well as Julian Roofing's business papers, at which point Julian Roofing essentially became defunct. The Defendants thereafter purchased and moved into a "distressed" property that had been foreclosed upon and stripped by the prior owner. The distressed property was located near the Dishmans' residence.

2. In 2007, the Dishmans hired John to repair the leaking roof of their house and were satisfied with John's work. Knowing that the Defendants had fallen on hard times with the destruction of their rented house and Julian Roofing and having been pleased with prior work done by Julian Roofing, Mr. Dishman ("Wally") approached John in July, 2008 shortly after the fire, to do renovation work to the Dishman home.

3. Although there was contradictory testimony as to who made the initial bid, suffice

to say that, on July 16, 2008, the Dishmans received a written proposal signed by both John and a "Dave Hawks" to do renovation work for $24,500 (the "Written Proposal").  The Written Proposal provided that the following work was to be done:

> ...install new windows threwout (sic) removing two windows from garage and patio and patio doors framing and insulating openings.  Install new steel entry door on garage new overhead door with opener, insulated door.  7 x 10.  Bay window on front window.  Tearing front porch out to open up install three new post (sic) and soffit ceiling of porch.  Install full view screen door on front.  Trim all windows out with 1 x 4 [illegible] aluminum wrap all exposed wood.  Vinyl soffit white. New 5" gutters and down spouts [illegible] house.  Vinyl 05" dutch lap white siding.  White trim and corners.  (Lifetime warranty windows).

(the "Renovations").  Wally did not accept the Written Proposal, as it was more than what the Dishmans were prepared to spend.  Negotiations as to the contract price ensued.  Negotiations were concluded by a verbal agreement between John and Wally that John would perform the Renovations for $19,500.

4. According to John, $12,000 was to be used for purchase of materials and the remaining $7,500 was for labor.

5. The Dishmans paid John $8,000 on August 23, 2008 and Wally testified that this was to be used to purchase materials.  There was no evidence regarding when construction "draws" would be due to John.  After the Dishmans had given John the initial $8,000 on August 23rd, they didn't see John for six (6) weeks. Wally "kept waiting" for John to come over to start the Renovations.  In October 2008, Wally went to the Defendants' house and told John he didn't want the Renovations to "take him into the winter".  Nonetheless, Wally paid John $6,000 on October 4, 2008 and John tore down the porch the following Monday.  The

3

       Dishmans paid John $2,000, $700 and $1500 on October 31, November 7 and November 14, 2008 respectively, for a total of $18,200.

6. Phil Boner was a friend of both John's and Wally's and he worked with John on the Renovations. The uncontroverted evidence was that John paid Phil $12 an hour for this work and paid him between $700 and $800 every Friday, although the math does not render the computation accurate. Phil routinely arrived at the worksite at 7 a.m. and left at 6 p.m. He was the only one there "for awhile". Materials were purchased once at the beginning of the Renovations but there were times when Phil had no materials to do the job.

7. The Dishmans grew dissatisfied with both the progress and the quality of the Renovations. The Dishmans' dissatisfaction with John's performance was: (1) he was not at the worksite regularly and, when he was, he did not arrive early, (2) he did not purchase what the Dishmans considered to be sufficient materials for the Renovation and (3) he was hard to contact and failed to respond to their phone calls. On November 14, 2008, the Dishmans gave John the last check of $1500. Between November 14, 2008 and November 21, 2008, Phil Boner removed John's tools from the worksite and he and Wally delivered them to John's house, telling John that he had been "fired". On November 20th, the Dishmans paid Phil Boner $2,000 and subsequently paid him another $1250 between December 1st and December 5th to finish the Renovations and haul away debris from the worksite.

8. John and Phil completed "close to half" the Renovations called for under the contract. Windows were installed but not trimmed out or sealed, the old porch

had been torn out, but the new one had not been put in, and the vinyl siding that had been installed was not secure. Phil Boner constructed the new porch, but it was a more "extravagant" porch than the one described in the Written Proposal.

9. The Dishmans sued John in the Madison County Circuit Court on August 18, 2009 for breach of contract, breach of express warranties, failure to provide warranties, and fraud with respect to a home improvement contract (the "State Court Action"). From the State Court Action's chronological case summary admitted into evidence as Plaintiffs' Exhibit 7, John responded to the Plaintiffs' request for admissions and otherwise actively represented himself in that proceeding. The matter went to bench trial where on March 3, 2010, the Dishmans were awarded damages of $11,087.71 and attorney fees of $4,195,39 for a total judgment of $15,283.10 (the "State Court Judgment"). There were several proceeding supplemental hearings between March 3, 2010 and June 6, 2012 wherein John appeared.

10. The Defendants filed their chapter 7 case on June 20, 2012.

### *Conclusions of Law*

1. Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor." *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992. The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983). The burden of proof required for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654,

112 L.Ed.2d 755 (1991). To further the policy of providing the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir.1994); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985).

### *§523(a)(2)(A)*

2. Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." .

3. Section 523(a)(2)(A) lists three separate grounds for non-dischargeability: actual fraud, false pretenses and false representation. Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground. *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).

4. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor obtained money, property or services through a false representation of fact, (2) which the debtor (a) either knew to be false or made with such reckless disregard for the truth as constitute a willful

misrepresentation and (b) made with intent to deceive; and (3) the creditor justifiably relied on the false representation to his detriment. *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010), *Scarpello*, 272 B.R. at 700.

5. "False pretenses" include "implied misrepresentations or conduct intended to create and foster a false impression". *Mem'l Hospital v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N. D. Ill. 1996). "False pretenses" do not necessarily require overt misrepresentations. "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor". *Id* at 928.

6. A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. *Scarpello,* at 700. "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression. *In re Hanson*, 432 B.R. 758, 772 (Bankr. N. D. Ill. 2010), citing, *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N. D. Ill. 1992).

7. "Actual fraud" is broader than misrepresentation in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability under the "actual fraud" prong of §523(a)(2). "Actual fraud" is defined as "any deceit, artifice, trick or design involving direct and active operation of the mind used to circumvent and cheat another" which includes "all

7

surprise, trick, cunning, dissembling, and any unfair way by which another is cheated". *McClellan*, at 893. In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor intended to defraud the creditor and (3) the fraud created the debt. *Hanson*, 432 B.R. at 772.

8. A creditor must also prove the debtor acted with the intent to deceive under all prongs of §523(a)(2)(A). A debtor's intent to deceive is measured by his or her subjective intention at the time the representation was made. *Scarpello*, 272 B.R. at 700. "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances". *Hanson*, 432 B.R. at 773.

9. Finally, a creditor seeking nondischargeability under §523(a)(2)(A) must show causation between the debtor's acts and the creditor's resulting injury by proving that the creditor "justifiably relied" on the debtor's false pretense, false representation or fraud. *Fields v Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). "Justifiable" reliance is an intermediate level of reliance which is less stringent than "reasonable" reliance but more stringent than "reliance in fact". *Id.* at 71. "Justifiable" reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id* at 70-72. "Justifiable " reliance is not measured from the objective person standard, but rather from the

experiences and characteristics of the particular creditor. *Id* at 71.

10. As an initial housekeeping matter, there was no evidence at trial that Defendant Joyce Julian participated in John's roofing business or the Renovations or made any representations to the Dishmans with respect to the Renovations. Indeed, the State Court Action named only John "individually and doing business as Julian Roofing" as a defendant. Accordingly, any debts owed to the Dishmans by Joyce are dischargeable.

11. The Dishmans' complaint in this adversary proceeding does not specify what express or implied misrepresentations John made to the Dishmans. The complaint only alleges that the Dishmans gave John money to do the repair work, the repair work was not completed as per the verbal contract between the parties, the Dishmans had to hire another contractor to complete the work, the Dishmans sued John and obtained a judgment against him, and "are of the opinion that they were intentionally defrauded". [1]

12. A breach of contact or the failure to perform work promised, or a failure to complete work according to standard practices, by itself, does not make a debt nondischargeable under §523(a)(2)(A). *McClellan*, 217 F.3d at 893; see also, *Merritt v. Wiszniewski (In re Wiszniewski)* 2010 WL 3488960 (Bankr. N D. Ill) at *7. In §523(a)(2)(A) cases involving a debtor/ contractor, "there are usually two ways to establish misrepresentation or fraud under §523(a)(2)(A): (1) to show

---

[1] Only a notation on the State Court CCS referring to the State Court Judgment is in evidence. If there is a separate State Court Judgment entry, it was not introduced and admitted into evidence and the Court does not have the benefit of determining whether the State Court Judgment made specific findings of fraud.

9

that the contractor executed the contract never intending to comply with its terms, or (2) to demonstrate that the contractor intentionally misrepresented a material fact or qualification when soliciting the work. *Scheidelman v. Henderson, (In re Henderson)*, 423 B.R 598, 622 (Bankr. N. D. N. Y. 2010).

13. With respect to *Henderson's* second prong, there was no evidence that John made express or implied misrepresentations to the Dishmans with respect to the Renovations. There was no evidence at trial about any express misrepresentations made my John regarding the draws to which he would be entitled, the benchmarks he had to complete to receive a draw, his qualifications to do the Renovations, whether he was bonded and insured, or any other material fact related to the Renovations.

14. There was no evidence of any implied misrepresentations wherein John failed to disclose a material fact with respect to the Renovations which created a false impression on the part of the Dishmans, and which was known to John. This is not a case where John knew and allowed the Dishmans to harbor the mistaken belief that he had particular expertise in hanging siding, or was bonded and insured, or any other material fact as to his qualifications or workmanship. John did not solicit the Renovations work from the Dishmans, the Dishmans contacted him to do the work and negotiated a more favorable price than John initially quoted them. Dishmans have not met their evidentiary burden by proving by a preponderance of the evidence that John made either express or implied misrepresentations, or that the debt was incurred by his "false representations" or "false pretenses" under §523(a)(2)(A).

15. Even if John made express or implied misrepresentations, he did not do so intentionally. Knowing that he was not well versed in hanging siding, he hired Phil Boner to handle that aspect of the Renovations. He testified that he paid Phil Boner $700-$800 every Friday. He completed at least half of the Renovations. He testified that after the fire that destroyed Julian Roofing, "things got tough" and that he and Joyce also incurred medical bills.

16. Furthermore, the Court concludes that, even if John knowingly made express or implied misrepresentations, the Dishmans did not justifiably rely on them. Wally testified that he thought at times John didn't order enough materials for the job. Both Dishmans testified as to John's tardiness to or failure to arrive at the worksite. These deficiencies were not hidden from the Dishmans, they observed them, and continued to write checks to John.

17. With respect to *Henderson's* first prong, the Court likewise concludes that the debt was not incurred by actual fraud. "Actual fraud", encompasses a "broader set of circumstances" than "false pretenses" and "false representations" in that it requires neither a misrepresentation on the part of the debtor nor reliance on the part of the creditor. Like "false pretenses" and "false representations", actual fraud requires scienter, or intent, and the focus is on the debtor's state of mind at the time the fraud was committed wherein a debtor's subsequent conduct may be relevant. *In re Hanson*, 437 B.R. 322, 327-328 (Bankr. N. D. Ill. 2010).

18. The Court is cognizant that John was paid $8,000 on August 23, 2008, and did not return to the Dishman house to begin the Renovations for six weeks, until Wally went to his house to tell John that he didn't want the Renovations taking

11

him into the winter. This time period coincides with the Defendants moving into their house in the Dishmans' neighborhood. It is the Dishmans' contention, without evidentiary support, that John used this and money they paid him subsequently to purchase this house.

19. The Defendants' Schedule D filed in their bankruptcy case shows that their residence is valued at $16,500, subject to a $14,000 mortgage owed to Ray Watson. When the Defendants moved into it, their home was a distressed property, most likely needing significant improvements. But there was no evidence whatsoever to prove that John used the Dishmans' money to buy materials for his own house. The only receipts in evidence are from Menards and Tops Home Center, with the earliest one bearing the date of November 24, 2008, and these receipts were part of Exhibit 4 which included the amounts paid to complete the Renovations after John was fired.

20. There was no evidence upon which the Court can even infer that the Defendant entered into the contract with the Dishmans with the intent to misuse the Dishmans' payments to pay for improvements to his own house rather than to perform the work for the Dishmans. Other than their "belief" that they had been defrauded, the Dishmans have given the Court no proof that John intended to defraud them when he and Wally orally agreed that John would do the Renovations. The Court simply cannot conclude that John made the oral agreement to do the Renovations with no intention of fulfilling it. Generally, the greater the extent of the debtor's performance, the less likely an intent to defraud, as a contractor-debtor "acting with intent to defraud will usually not

undertake any significant measures toward the performance of their obligation". *Hanson,* 437 B.R. at 329, quoting *Siebanoller v. Rahrig (In re Rahrig)*, 373 B.R. 829, 834 (Bankr. N. D. Ohio 2007).  Here, John completed at least half, if not more, of the Renovations and hired Phil Boner to handle an aspect of the Renovations that he did not feel comfortable doing.  His failure to complete the Renovations may have been the result of sloppy work habits, but it was not the result of fraud. Accordingly, the debt owed by John to the Dishmans is DISCHARGEABLE.  The Court will enter judgment in favor of the Defendants.

### # # #

Vance W. Curtis, Attorney for the Plaintiffs /Juan A. Perez, Jr., Attorney for the Defendants